THOMAS C. CRONIN (SBN 200754)
CRONIN & CO., LTD.
120 LaSalle Street, 20th Floor
Chicago, Illinois 60602
Telephone: 312.500.2100

ROBERT R. DUNCAN (PRO HAC VICE FORTHWITH)
JAMES PODOLNY (PRO HAC VICE FORTHWITH)
DUNCAN LAW GROUP, LLC
161 North Clark St., Suite 2550
Chicago, Illinois 60601
Telephone: 312-202-3283

MATTHEW P. KELLY (SBN 224297)
THE LAW OFFICE OF MATTHEW P. KELLY
4652 Glenalbyn Drive
Los Angeles, CA 90065
Telephone: 310-483-3608

***Attorney for Plaintiff, Germaine Gaudet, and all others
similarly situated***

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **GERMAINE GAUDET, and all others similarly situated**, <br><br> Plaintiff, <br><br> vs. <br><br> **METROPOLITAN LIFE INSURANCE COMPANY**, <br><br> Defendant. | **Case No. _____** <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> **i) Fraud by Omission** <br><br> **ii) Violation of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*** <br><br> **iii) Violation of California Insurance Code Section 10234.8, Cal. Ins. Code § 10234.8** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff, GERMAINE GAUDET ("Plaintiff"), by and through her attorneys, CRONIN &

CO., LTD., DUNCAN LAW GROUP, LLC, and THE LAW OFFICE OF MATTHEW P. KELLY,

complaining of the Defendant, METROPOLITAN LIFE INSURANCE COMPANY (hereinafter "MetLife"), for her Complaint at Law, on behalf of herself and all others similarly situated, states:

## NATURE OF THE ACTION

1.     This Plaintiff purchased a MetLife long-term care insurance policy that was guaranteed renewable in 2007 and renewed it every year since then. Although MetLife knew that Plaintiff's long-term care insurance policy was underpriced and that it would need to increase her premiums since at least 2008, MetLife failed to tell Plaintiff as much until April 15, 2021, when it notified her that it was increasing her premiums by 123.8%.  At all times relevant hereto, MetLife had a duty to notify Plaintiff about future premium increases and benefit reductions when she purchased and/or renewed her policy.

2.     Had Plaintiff known that her policy was underpriced and/or that MetLife planned to increase her premiums in the future, she either: (1) would not have purchased her long-term care insurance policy and/or annually renewed it between 2008 and 2021; and/or (2) would have reduced her premiums by decreasing her coverage some time before 2021. By failing to satisfy its disclosure obligations, MetLife committed fraud, engaged in "unfair competition" under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and violated its statutory duties of honesty and good faith and fair dealing under California Insurance Code Section 10234.8.

## THE PARTIES

3.     Plaintiff, Germaine Gaudet, who resides in San Jose, California, owns MetLife long-term care insurance policy number 14630-5986, a copy of which is attached as Exhibit A.

4.     Defendant, MetLife, is a corporation organized under the laws of the State of New York, with its principal place of business in New York, New York. MetLife, therefore, is a citizen

of New York. MetLife is licensed to do business in the State of California and regularly conducts

business in the Northern District of California and the State of California generally.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A),

as modified by the Class Action Fairness Act of 2005, because at least one member of the putative

classes is a citizen of a different state than Defendant, there are more than 100 members in each

putative class, and upon information and belief the aggregate amount in controversy exceeds

$5,000,000.00 exclusive of interest and costs.

6.      This Court has personal jurisdiction over MetLife pursuant to California's long-

arm statute, Cal. Civ. Proc. Code § 410.10, because this complaint concerns: (1) one or more

tortious acts that MetLife committed in California; (2) business that MetLife transacted within

California; and (3) one or more contracts and/or omissions MetLife made that are substantially

connected with California.

7.      Venue is appropriate because "a substantial part of the events or omissions giving

rise to the claim[s] occurred" in the Northern District of California and MetLife "resides" in the

Northern District of California. 28 U.S.C. § 1391.

8.      Plaintiff—who has resided in Santa Clara County, California at all times relevant

hereto—purchased the long-term care insurance policy at issue in Santa Clara County, California.

Thus, a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in Santa

Clara County, and this action should be assigned to the San Jose Division.

## FACTUAL ALLEGATIONS

*MetLife's VIP1 and VIP2 LTCI Policies*

9.      MetLife (the country's third largest long-term care insurer by number of in-force policies) sold long-term care insurance from 1986 until 2011.

10.      In 2002, MetLife introduced a nationwide series of individually underwritten long-term care insurance ("LTCI") policy forms called the VIP1 policy series.

11.      The VIP1 policy series consisted of the LTC-FAC, LTC-IDEAL, LTC-PREM, and LTC-VAL policy forms and various endorsements and/or riders.

12.      The LTC-FAC policy form provides coverage for long-term care services received in a nursing home, assisted living facility, or hospice facility.

13.      The LTC-VAL, LTC-IDEAL and LTC-PREM policy forms provide comprehensive long-term care coverage.

14.      Between 2002 and 2009, MetLife sold more than 110,000 VIP1 policies across all 50 states and the District of Columbia.

15.      In 2005, MetLife replaced the VIP1 policy series with a new series of individually underwritten LTCI policy forms called the VIP2 policy series.

16.      The VIP2 policy series consisted of the LTC2-FAC, LTC2-IDEAL, LTC2-PREM, and LTC2-VAL policy forms and various endorsements and/or riders.

17.      The LTC-FAC policy form provides coverage for long-term care services received in a nursing home, assisted living facility, or hospice facility.

18.      The LTC2-VAL and LTC2-IDEAL policy forms provide comprehensive long-term care coverage.

19.     The LTC2-PREM policy form pays qualifying insureds a specific daily benefit amount that does "not depend on the cost of services or supplies the insured[s] receive[]." *McHugh v. Metro. Life Ins. Co.*, C.D. Cal. Case No. 2:22-cv-06152, ECF No. 34-3 at 6.

20.     Between 2005 and 2011, MetLife sold more than 77,000 VIP2 policies across all 50 states and the District of Columbia.[1]

21.     All VIP2 policies (regardless of issue state) were guaranteed renewable (i.e., MetLife guaranteed insureds the chance to renew their VIP2 policies annually) and contained identical language allowing MetLife to "change premium rates on a class basis," "subject to applicable state Insurance Department approval."

22.     Specifically, all VIP2 policies stated:

> **RENEWABILITY: THIS POLICY IS GUARANTEED RENEWABLE FOR LIFE. PREMIUM RATES ARE SUBJECT TO CHANGE.** This means You have the right, subject to the terms of the policy, to continue this policy as long as You pay Your premiums on time. We cannot change any of the terms of this policy without Your consent, except that We may change the premium rates, subject to applicable state Insurance Department approval. Any such change in premium rates will apply to all policies in the same class as Yours in the state where this policy was issued.
>
> …
>
> The premium is due and payable on the **Original Coverage Effective Date** of the policy and thereafter in accordance with the Premium Schedule that is in effect for the policy as shown on page 3. The premium must be paid in U.S. currency.
>
> You may change the premium payment mode with Our approval.
>
> The amount of the premium for Your initial coverage is based on Your Original Issue Age, Health Rating and Discounts, as of the Original Coverage Effective Date as shown on page 3.

---

[1] Any subsequent references to the United States of America's constituent states encompass the District of Columbia.

> We reserve the right to change premium rates on a class basis. The premium will not increase because You get older or Your health changes. In the event of a premium increase, We will offer You the option to lower Your premium by decreasing Your benefit amounts. See the Benefit Decreases provision of this policy. Your premiums will change if We change Your benefit amounts as a result of Your request or as a result of an increase as provided under the terms of this policy.

*McHugh v. Metro. Life Ins. Co.*, C.D. Cal. Case No. 2:22-cv-06152, ECF No. 34-3 at 11, 86, 156, 225.

*MetLife's Longstanding LTCI Pricing Issues*

23.     At all times relevant hereto, MetLife made assumptions about future experience to price its long-term care insurance policies.

24.     MetLife makes assumptions about the following factors to predict future experience: (1) interest rates on invested assets; (2) mortality rate (how long policyholders live); (3) lapse/persistency rate (how many policyholders keep their policies); (4) claim incidence rate (how often policyholders claim benefits for long term care services covered by their policies); (5) claim continuance/termination (how long policyholders claim benefits for long term care services under their policies); and (6) utilization (the amount of benefits an insured uses when he/she goes on claim compared to the benefits available under his/her policy). Claims incidence, claim termination, and utilization are often grouped together and considered to be "morbidity assumptions."

25.     At all times relevant hereto, MetLife based its underlying VIP2 assumptions and projections on nationwide experience.

26.     At all times relevant hereto, MetLife conducted annual "Experience Studies" of its individual long-term care insurance business.

27.     MetLife's annual "Experience Studies" are important because small changes in interest rates, lapse/persistency rates, morbidity rates, and/or mortality rates have disproportionate impacts when applied to an entire policy block over its expected lifetime. For example, MetLife's lapse and mortality assumptions help it estimate how large its future claimant pool will be. If fewer-than-expected policyholders die and/or let their policies lapse each year, the claimant pool will be larger than assumed and MetLife will have less retained premiums from lapsed policies than it anticipated having.

28.     When "Experience Studies" show that MetLife's actual interest, lapse, morbidity, and mortality experience materially and adversely deviate from its assumed interest, lapse, morbidity, and mortality experience, MetLife knows it needs to update its pricing assumptions and request premium rate increases on its individual LTCI policies.

29.     Because the assumptions and projections MetLife uses to price its individual LTCI policies are based on nationwide experience, MetLife determines the amount of any premium rate increases it needs on a nationwide basis and then files uniform premium rate increase requests for that amount in each state where it sold the relevant policies.

30.     States, in turn, either (1) approve premium rate increases that are equal to, less than or greater than the ones MetLife requested or (2) deny the requests.

31.     MetLife accounts for differences in state-approved premium rate increases when calculating subsequent premium rate increases. For example, if a state approves less than the needed increase, MetLife will request additional and/or larger increases in that state to make up for the expected shortfall.

32.     When pricing its VIP1 policies in or before December 2001, MetLife based its morbidity assumptions on the 1985 and 1995 National Nursing Home Surveys, and the 1989 and

1994 National Long-Term Care Survey of disabled elders in the Community. MetLife based its mortality assumptions on the 1983 Group Annuity Mortality (GAM) Table. MetLife assumed lapse rates of: 6%-8% for year 1; 5%-6% for year 2; 4% for year 3; and 3% for year 4 and beyond. MetLife assumed a 6% annual interest rate.

33.     Over the following years, MetLife's actual mortality, lapse, morbidity and interest experience deviated adversely from its initial pricing assumptions.

34.     By 2004, MetLife knew its VIP1 policies were underpriced and that it would need to increase VIP1 policyholders' premium rates.

35.     Instead of increasing VIP1 policyholders' premium rates—which would have raised policyholder and potential customer concerns about the viability and riskiness of MetLife's LTCI policies—MetLife sought to replace its VIP1 policy series with the VIP2 policy series.[2]

36.     In the actuarial memoranda MetLife submitted to state insurance departments to justify its proposed VIP2 premium rates, MetLife stated:

> Pricing assumptions for our currently filed and approved [VIP1] policies and riders were based on general population data and actuary's best judgement given information available at the time.
>
> The company has now accumulated a credible amount of internal experience. This has permitted the company to review the actual-to-expected relationship for the pricing assumptions (lapse, mortality, claims incidence, and claims continuance). Our analysis shows the company's experience has materially deviated from that assumed in the pricing with respect to the forms that are being replaced by this filing [i.e., VIP1 policy forms], to the extent that changes in assumptions for new business are required. While the company's experience is mainly on the group side, our experience has been augmented by the results of an internal competitive benchmark study of individual marketplace rate structures.

---

[2] MetLife did not want to increase VIP1 policyholders' premiums because state insurance regulations generally require them to disclose their LTCI premium rate increase histories to prospective purchasers. Replacing the VIP1 series with the more accurately priced VIP2 policy series allowed MetLife to delay seeking much-needed premium rate increases and avoid raising customer concerns while limiting the extent of its VIP1 underpricing issue going forward.

> …
>
> The premium rate schedule [for the proposed VIP2 policy forms] is not less than the premium rate schedule for existing [VIP1] policy forms that are being replaced.
>
> The primary difference between the proposed plans/forms [VIP2 policies] and forms currently in use [VIP1 policies] is that underlying assumptions for proposed plans/forms have been updated to reflect the industry as well as the company's experience. Impact on rates due to lower morbidity and lower lapse offset each other somewhat. Lower interest rate, however, is the main reason that rates for the proposed plans are higher than that of current forms.

*McHugh v. Metro. Life Ins. Co.*, C.D. Cal. Case No. 2:22-cv-06152, ECF No. 34-3 at 463, 490.

37.    When pricing its VIP2 policies, MetLife based its morbidity assumptions on the Society of Actuaries' long-term care insurance valuation diskette (which was released in or around 1995 and was based "on the results of the 1985 National Nursing Home Survey and the 1982-84 National Long Term Care Survey"), the actual experience of MetLife's LTCI business, and "an internal analysis of MetLife's Competitors' Rate Structures." *Id.* at 478. MetLife based its mortality assumptions on the Annuity 2000 Basic Mortality Table (which the National Association of Insurance Commissioners adopted as an appropriate table for valuing annuity interests in 1996 and which The Society of Actuaries' Committee on Life Insurance Research previously identified as its "best estimate of the mortality pattern that has resulted from the mortality improvement experienced since 1983") modified by Projection Scale H. *Id.* at 479. MetLife assumed lapse rates of: 6.25% for year 1; 3.5% for year 2; 3% for years 3-7; 2.5% for year 8; 2.25% for year 9; 2% for years 10-12; 1.75% for years 13-14; and 1.5% for years 15 and beyond. *Id.* at 479. MetLife assumed a 4% annual interest rate. *McHugh v. Metro. Life Ins. Co.*, C.D. Cal. Case No. 2:22-cv-06152, ECF No. 34-5 at 184.

38.     By 2008, MetLife's Experience Studies showed that its actual mortality, lapse, morbidity and/or interest experience deviated materially and adversely from its initial VIP2 pricing assumptions. Therefore, MetLife's VIP2 policies were underpriced, and MetLife needed to increase VIP2 policyholders' premium rates.

39.     Instead of increasing VIP2 policyholders' premium rates and incurring the negative publicity associated with premium rate increases, MetLife decided to replace VIP2 policies' premium rate schedule with one based on updated/more accurate lapse, morbidity and mortality assumptions.

40.     In correspondence with state insurance departments regarding its VIP2 premium rate schedule replacement, MetLife stated:

> We are submitting this premium rate schedule filing due to material changes in pricing assumptions including lapse and mortality. In addition, MetLife has accumulated credible experience of claims incidence and claims severity to develop our own morbidity assumptions. This is different from our prior filings where, for example, morbidity assumptions were heavily influenced by industry experience.

41.     When creating its new VIP2 premium rate schedule in or around 2008, MetLife based its morbidity assumptions on "[then-]recent internal company experience studies[,] analyz[ing] incident rates, continuance rates and utilization for MetLife's existing blocks of Long Term Care business including individually underwritten business." MetLife based its mortality assumptions on the Annuity 2000 Basic Mortality Table and then-"recent internal company experience studies." MetLife assumed lapse rates of: 5.5% for year 1; 3% for year 2; 1.75% for year 3; 1.55% for year 4; 1.4% for year 5; 1.2% for year 6; 1% for year 7; 0.95% for year 8; and 0.9% for years 9 and beyond. MetLife assumed a 4% annual interest rate.

42.     A chart MetLife filed with Virginia's State Corporation Commission comparing the assumptions MetLife used to initially price its VIP2 policy series and those it used to create its new premium rate schedule is attached as Exhibit B.

43.     MetLife introduced its new VIP2 premium rate schedule in all 50 states and the District of Columbia between 2008 and 2010.

44.     The new premium rate schedule only applied to individuals purchasing new VIP2 policies. It did not impact existing VIP2 policyholders. VIP2 policies purchased before MetLife replaced the premium rate schedule between 2008 and 2010 are hereinafter called "VIP2 OLD" policies. VIP2 policies purchased after MetLife replaced the premium rate schedule are hereinafter called "VIP2 NEW" policies.

45.     Therefore, the new VIP2 premium rate schedule did not remediate VIP2 OLD policies' underpricing issue or MetLife's need for a premium rate increase on said policies.

46.     MetLife did not notify VIP2 OLD policyholders that it replaced VIP2 OLD policies' premium rate schedule.

47.     After MetLife replaced VIP2 OLD policies premium rate schedule, MetLife's actual interest, lapse, morbidity, and/or mortality experience materially and adversely deviated from the interest, lapse, morbidity, and/or mortality assumptions MetLife used to create its VIP2 NEW premium rate schedule. Therefore, MetLife needed to increase VIP2 OLD policyholders' premiums further.

48.     To address its ongoing pricing issues, MetLife developed a rate action plan regarding its VIP2 OLD policy series (hereinafter called the "VIP2 OLD Rate Action Plan") in or around 2012.

49.     Pursuant to the VIP2 OLD Rate Action Plan, MetLife sought to implement a 58% premium rate increase on all VIP2 OLD policyholders across the country.

50.     Between October 2012 and July 2014, MetLife filed premium rate increase requests seeking a 58% premium rate increase on all VIP2 OLD policyholders with all but one state insurance department.[3]

51.     According to the actuarial memoranda MetLife submitted to state insurance departments in connection with its 58% premium rate increase requests, MetLife based its morbidity assumptions on its "actual experience through September 2011." MetLife based its mortality assumptions on "88% of Annuity 2000 Basic Table with selection consistent with experience." MetLife assumed lapse rates of: 5% for year 1; 4.5% for year 2; 4% for year 3; 3.5% for year 4; 2.5% for year 5; 2% for year 6; 1.8% for year 7; 1.6% for year 8; 1.5% for year 9; 1.35% for year 10; and 1.25% for years 11 and beyond. MetLife assumed the maximum valuation interest rate for contract reserves, which average to 4.0%.

52.     A chart MetLife filed with the Oklahoma Insurance Department comparing MetLife's original VIP2 OLD pricing assumptions with those used in connection with its 58% premium rate increase requests is attached as Exhibit C.

53.     Due to state regulatory considerations, MetLife subsequently implemented 10%-88% premium rate increases on VIP2 OLD policyholders in 37 states between 2012 and 2017.

54.     Between the time MetLife first introduced its VIP2 policy series and the time it implemented the aforementioned 10%-88% premium rate increases, MetLife never told affected policyholders: (1) that its actual experience deviated from the assumptions it used to initially price VIP2 OLD policies; (2) that its VIP2 OLD policies were underpriced; (3) that MetLife intended to

---

[3] MetLife did not have to file a premium rate increase request in Alaska because Alaska does not require insurers to file their LTCI rates with the Alaska Division of Insurance before using them.

increase VIP2 OLD policyholders' premiums; (4) that it replaced the VIP2 OLD policy series' premium rate schedule with a more accurate one in 2008-2010; and/or (5) that it could justify VIP2 OLD premium rate increases actuarially since at least 2008.

55.    The Arkansas Insurance Department, California Department of Insurance, Connecticut Insurance Department, Indiana Department of Insurance, Kentucky Department of Insurance, Louisiana Department of Insurance, Minnesota Department of Commerce, New Mexico Office of the Superintendent of Insurance, Rhode Island Department of Business Regulation, Texas Department of Insurance, Utah Insurance Department, Vermont Department of Financial Regulation, Virginia State Corporation Commission's Bureau of Insurance, and West Virginia Offices of the Insurance Commissioner denied MetLife's 58% premium rate increase requests entirely. Therefore, MetLife did not implement any premium rate increases on VIP2 OLD policyholders in Arkansas, California, Connecticut, Indiana, Kentucky, Louisiana, Minnesota, New Mexico, Rhode Island, Texas, Utah, Virginia, Vermont and West Virginia as part of its VIP2 OLD Rate Action Plan.

56.    MetLife did not notify VIP2 OLD policyholders in the foregoing states that it requested a premium rate increase on their policies and/or that their state insurance departments denied said request.

57.    VIP2 OLD policyholders in the foregoing states could not have reasonably discovered the foregoing premium rate increase requests via independent investigation.

58.    After MetLife implemented its VIP2 OLD Rate Action Plan, MetLife's actual interest, lapse, morbidity, and/or mortality experience continued to materially and adversely deviate from the interest, lapse, morbidity, and/or mortality assumptions MetLife used in

connection with its VIP2 OLD Rate Action Plan. Therefore, MetLife needed to increase VIP2 OLD policyholders' premiums further.

59.     Thus, in or around 2015, MetLife developed a second rate action plan regarding its VIP2 OLD policy series (hereinafter called the "Second VIP2 OLD Rate Action Plan"), pursuant to which it sought to implement an additional 18.98% premium rate increase on all VIP2 OLD policyholders across the country.

60.     MetLife sought to achieve a cumulative premium rate increase of about 88% on its VIP2 OLD policies by the time its Second VIP2 OLD Rate Action Plan was fully implemented.

61.     Pursuant to its Second VIP2 OLD Rate Action Plan, MetLife filed various premium rate increase requests with all but three state insurance departments between 2015 and 2019.[4]

62.     In connection with its VIP2 OLD Rate Action Plan, MetLife filed a 105% VIP2 OLD premium rate increase request with the California Department of Insurance in 2019.[5]

63.     A chart MetLife filed with the California Department of Insurance comparing its original VIP2 OLD pricing assumptions and those used in connection with its Second VIP2 OLD Rate Action Plan is attached as Exhibit D.

64.     On or about January 21, 2021, the California Department of Insurance approved a 123.8% premium rate increase on all VIP2 OLD policyholders in the State of California.

65.     MetLife implemented the foregoing premium rate increase between 2021 and 2022.

---

[4] In response to MetLife's VIP2 OLD Rate Action Plan premium increase requests in 2012 and 2013, the Arizona Department of Insurance and Financial Institutions and the Illinois Department of Insurance required MetLife to implement an 88% premium rate increase on VIP2 OLD policyholders in Arizona and Illinois. Therefore, MetLife did not file premium rate increase requests with the Alaska Division of Insurance (which, as previously mentioned, did not require MetLife to file such requests before increasing Alaska policyholders' premium rates), the Arizona Department of Insurance and Financial Institutions or the Illinois Department of Insurance in connection with its Second VIP2 OLD Rate Action Plan.

[5] MetLife requested a premium rate increase of more than 88% in California to account for the shortfall caused by the California Department of Insurance's failure to approve its previous premium rate increase request.

66.     Between the time MetLife first introduced its VIP2 policy series and the time it increased California VIP2 OLD policyholders' premiums in 2021-2022, MetLife never disclosed to said policyholders: (1) that its actual experience deviated from the assumptions it used to initially price VIP2 OLD policies; (2) that its VIP2 OLD policies were underpriced; (3) that MetLife intended to increase VIP2 OLD policyholders' premiums; (4) that it replaced the VIP2 OLD policy series' premium rate schedule with a more accurate one in 2008-2010; (5) that it could justify VIP2 OLD premium rate increases actuarially since at least 2008; (6) that it sought permission for a 58% premium rate increase on all VIP2 OLD policyholders around the country between 2012 and 2014; and/or (7) that the California Department of Insurance denied MetLife's previous premium rate increase request.

67.     Since 2015, MetLife (who has imposed premium rate increases on VIP2 OLD policyholders in every state) has created at least three more rate action plans, pursuant to which it sought to increase VIP2 OLD policyholders' premiums by about: 16.92% in or around 2019-2020; 31.66% in or around 2021; and 9.88% in or around 2023.

68.     Thus, by the time its existing rate action plans are fully implemented, MetLife will have increased all VIP2 OLD policyholders' premiums by about 218%.

69.     Based on information and belief, MetLife has fully implemented its existing VIP2 OLD rate action plans in Alaska, Ohio, Washington and Wyoming.

70.     Based on information and belief, MetLife has not disclosed the full extent of its existing rate action plans to VIP2 OLD policyholders in the 47 other states where it sold VIP2 OLD policies.

*Germaine Gaudet*

71.    In November 2006, then-50-year-old Plaintiff applied for and purchased MetLife long-term care insurance policy number 14630-5986 ("Policy No. 14630-5986"), a VIP2 OLD policy that included MetLife's LTC2-VAL-CA policy form, 5% Automatic Compound Inflation Protection Rider, Calendar Day Rider, and Indemnity Rider. *See* Ex. A at 3, 55.

72.    Policy No. 14630-5986 had an effective date of coverage of January 19, 2007. *Id.* at 3. Because Plaintiff has renewed Policy No. 14630-5986 each year since 2007, Policy No. 14630-5986 has been in effect since January 19, 2007.

73.    Regarding MetLife's ability to increase premiums, Policy No. 14630-5986 stated:

> **RENEWABILITY: THIS POLICY IS GUARANTEED RENEWABLE FOR LIFE. PREMIUM RATES ARE SUBJECT TO CHANGE.** This means You have the right, subject to the terms of the policy, to continue this policy as long as You pay Your premiums on time. We cannot change any of the terms of this policy without Your consent, except that We may change the premium rates, subject to approval by the California Department of Insurance. Any such change in premium rates will apply to all policies in the same class as Yours in the state where this policy was issued.
>
> …
>
> The premium is due and payable on the **Original Coverage Effective Date** of the policy and thereafter in accordance with the Premium Schedule that is in effect for the policy as shown on page 3. The premium must be paid in U.S. currency.
>
> You may change the premium payment mode with Our approval.
>
> The amount of the premium for Your initial coverage is based on Your Original Issue Age, Health Rating and Discounts, as of the Original Coverage Effective Date as shown on page 3.
>
> We reserve the right to change premium rates on a class basis. The premium will not increase because You get older or Your health changes. In the event of a premium increase, We will offer You the option to lower Your premium by decreasing Your benefit amounts.

See the Benefit Decreases provision of this policy. Your premiums will change if We change Your benefit amounts as a result of Your request or as a result of an increase as provided under the terms of this policy.

…

**Your premium is not expected to increase as a result of the benefit increases provided by [the 5% Automatic Compound Inflation Protection] Rider. However, We reserve the right adjust premiums on a class basis.**

*Id.* at 1, 26, 34.

74.    When Plaintiff purchased Policy No. 14630-5986, her "Total Annual Premium" was $2,944.45. *Id.* at 3.

75.    MetLife never told Plaintiff that it replaced California's VIP2 OLD policies' premium rate schedule with a more accurate one in or around 2010.

76.    MetLife never told Plaintiff that it sought permission for a 58% premium rate increase on all California VIP2 OLD policies in 2013 and/or that the California Department of Insurance denied said request.

77.    On April 15, 2021, Met Life notified Plaintiff that it would be increasing her annual premium by 123.8% over the next four years. Exhibit E.

78.    The increase took effect on January 19, 2022. *Id.* at 1.

79.    MetLife allowed Plaintiff to mitigate the effects of the rate increase and/or reduce her premiums by: (1) eliminating her automatic inflation protection; (2) reducing her annual automatic compound inflation protection rate from 5% to 3%; (3) reducing her daily benefit amount; (4) reducing her benefit duration from lifetime to three years; or (5) canceling her policy. *Id.* at 6.

80.     On or about April 15, 2022, April 15, 2023 and April 15, 2024, MetLife notified Plaintiff that it would implement the second, third and fourth phases of its 123.8% premium rate increase on January 19, 2023, January 19, 2024 and January 19, 2025, respectively. With each notification, MetLife allowed Plaintiff to mitigate the effects of the premium rate increase by: (1) eliminating her automatic inflation protection; (2) reducing her annual automatic compound inflation protection rate from 5% to 3%; (3) reducing her daily benefit amount; (4) reducing her benefit duration from lifetime to three years; or (5) canceling her policy.

81.     In response to MetLife's April 15, 2024 correspondence, Plaintiff elected to reduce her inflation protection rate from 5% to 3%, which gave her an annual premium of $4,541.48.

## CLASS ALLEGATIONS

82.     Plaintiff brings this action on behalf of herself, and all others similarly situated, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following classes:

> **The Nationwide Class:** All persons who purchased a MetLife VIP2 OLD long-term care insurance policy and have been subjected to one or more "class"-wide premium rate increases without first receiving full disclosure of MetLife's then-existing rate action plan(s) at any time since 2013.

> **The California Subclass:** All persons who purchased a MetLife VIP2 OLD long-term care insurance policy in the State of California and were subjected to a phased-in 123.8% premium rate increase starting in 2021 or 2022.

83.     The Nationwide Class and California Subclass are collectively called the "Classes."

84.     The Classes are so numerous that joinder of all members is impracticable. Due to the nature of the trade and commerce involved, class members are geographically dispersed throughout the United States of America and the State of California. On information and belief,

the Nationwide Class includes more than 50,000 members. On information and belief, the California Subclass includes more than 4,600 members.

85.     Plaintiff's claims are typical of the claims of the other class members she seeks to represent because Plaintiff and all Nationwide Class and California Subclass members: (1) purchased VIP2 OLD long-term care insurance policies containing uniform language about MetLife's ability to increase premiums; and (2) were subjected to premium rate increases that were part of a common plan. Moreover, MetLife withheld the same information from every Nationwide Class and California Subclass member.

86.     Plaintiff will fully and adequately protect the interests of all Nationwide Class and California Subclass members. Plaintiff has retained counsel experienced in complex class action and insurance litigation. Plaintiff has no interest that is adverse to, or in conflict with, other Nationwide Class and California Subclass members.

87.     Questions of law and fact common to all Nationwide Class and California Subclass members (including but not limited to: whether MetLife had a duty to disclose future premium rate increases it intended to impose on VIP2 OLD policyholders at the time said policyholders purchased and/or renewed their policies; whether MetLife's failure to satisfy said duty constitutes an "unfair business practice" under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; and whether MetLife breached its statutory duties of honesty and good faith and fair dealing, Cal. Ins. Code § 10234.8, by failing to disclose known future premium rate increases when VIP2 OLD policyholders purchased and/or renewed their policies) predominate over any questions that may affect only individual members.

88.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. The

prosecution of separate actions by individual Nationwide Class and California Subclass members would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to all Nationwide Class and California Subclass members. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

89.     The interest of the Nationwide Class and California Subclass members in individually controlling the prosecution of separate actions is theoretical rather than practical. The Nationwide Class and California Subclass members have a high degree of cohesion, and prosecution of the action through a representative would be unobjectionable. The damages suffered by the individual class members are uniform, and the expense and burden of individual litigation might make it virtually impossible for them to redress the wrongs done to them. Plaintiff anticipates no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION
### (Fraud by Omission)

90.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 89 as if fully set forth herein.

91.     Plaintiff brings this cause of action on behalf of the Nationwide Class.

92.     MetLife knew its VIP2 OLD policies were underpriced and that it would need to increase VIP2 OLD policyholders' premium rates since at least 2008 (the year MetLife sought to replace VIP2 OLD policies' premium rate schedule with one based on updated and more accurate pricing assumptions).

93.     At all times relevant hereto, MetLife had a duty to disclose to VIP2 OLD policy purchasers (including Plaintiff) and individuals renewing their existing VIP2 OLD policies that its

VIP2 OLD long-term care insurance policies were underpriced and/or that it intended to increase their premiums.

94.     Despite its knowledge and duty, MetLife failed to tell Plaintiff that Policy No. 14630-5986 was underpriced and/or that it would need to increase her premiums before Plaintiff purchased her policy in 2007 and/or before Plaintiff renewed her policy in 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020 and 2021.

95.     On April 21, 2021, MetLife notified Plaintiff that it would implement a 123.8% premium rate increase starting on January 19, 2022. Ex. E. However, MetLife failed to disclose in its April 21, 2021, April 21, 2022, April 21, 2023, and/or April 21, 2024 correspondence regarding the 123.8% increase: (1) that it intended to cumulatively increase VIP2 OLD Policyholders' premium rates by about 189.39% as of 2021 and by about 218% as of 2023; and/or (2) that it intended to increase Plaintiff's premium rate by more than the 123.8% referenced in its 2021-2024 correspondence.

96.     Stated differently, the April 21, 2021 – April 21, 2024 correspondence failed to put Plaintiff on notice that MetLife was going to increase her premiums again after January 19, 2025.

97.     MetLife has not otherwise told Plaintiff that it plans to increase her premiums after January 19, 2025.

98.     Thus, MetLife again failed to tell Plaintiff that Policy No. 14630-5986 was underpriced and/or that it needed to increase her premiums further before Plaintiff renewed her policy in 2022, 2023, 2024 and 2025.

99.     Because MetLife requests the California Department of Insurance keep its long-term care insurance rate filings confidential and does not otherwise publish its internal premium rate increase plans, Plaintiff could not have learned that Policy No. 14630-5986 was underpriced

and/or that MetLife planned to increase VIP2 OLD policyholders' premiums at the time she purchased and/or renewed her policy.

100.    Because individuals generally purchase LTCI about 20-25 years before they expect to make a claim under their policies and generally consider price and economic value to be the most important factors when making purchasing decisions, information about known future premium rate increases is material to any LTCI purchase and renewal decisions.

101.    Had Plaintiff known that Policy No. 14630-5986 was underpriced and/or that MetLife planned to increase VIP2 OLD policyholders' premiums, Plaintiff: (1) would have relied on and considered that information; (2) would not have purchased Policy No. 14630-5986 and/or annually renewed it between 2008 and 2025; and/or (3) would have reduced her premiums by lowering her benefits and/or inflation protection before April 15, 2021.[6]

102.    MetLife intended Plaintiff rely on its omissions and/or misleading partial representations when deciding to purchase and/or renew Policy No. 14630-5986.

103.    Plaintiff justifiably relied on MetLife's omissions and/or misleading partial representations when deciding to purchase and/or renew Policy No. 14630-5986.

104.    As a direct and proximate result of the foregoing omissions and/or misleading partial representations, Plaintiff suffered damages in the form of premiums paid for Policy No. 14630-5986 that she would not have otherwise paid and/or premiums that were higher than they otherwise would have been had MetLife disclosed the omissions at issue.

---

[6] Based on information and belief, at all times mentioned herein, VIP2 OLD policyholders could reduce their premiums by decreasing their daily benefit amounts and/or reducing their inflation protection whenever they wanted to.

## SECOND CAUSE OF ACTION
### (Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*)

105.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 104 as if fully set forth herein.

106.    Plaintiff brings this cause of action on behalf of the California Subclass.

107.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, prohibits "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

108.    An insurer's failure to notify insureds about forthcoming premium increases and/or benefit reductions when they purchase and/or renew their insurance policies constitutes "unfair competition" under the UCL.

109.    Since at least 2008, MetLife knew that its VIP2 OLD policies were underpriced and that it needed to increase VIP2 OLD policyholders' premium rates.

110.    Thus, MetLife engaged in "unfair competition" by failing to notify Plaintiff that Policy No. 14630-5986 was underpriced and/or that it planned to increase her premiums when she purchased her policy in 2007 and each time she renewed it between 2008 and 2025.

111.    As a direct and proximate result of MetLife's "unfair competition," Plaintiff suffered injury and damages in the form of premiums paid for Policy No. 14630-5986 that she would not have otherwise paid and/or premiums that were higher than they otherwise would have been had MetLife disclosed the omissions at issue.

112.    As a direct and proximate result of its "unfair competition," MetLife has been unjustly enriched and should be ordered to make restitution to Plaintiff pursuant to Business and Professions Code Sections 17203 and 17204. Cal. Bus. & Prof. Code §§ 17203-17204.

113.     MetLife's "unfair competition," as described herein, presents a continuing threat to Plaintiff and the California Subclass in that MetLife persists and continues to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. MetLife's conduct is causing, and will continue to cause, irreparable injury to Plaintiff and the California Subclass unless enjoined or restrained.

**THIRD CAUSE OF ACTION**
**(Violation of California Insurance Code Section 10234.8, Cal. Ins. Code § 10234.8)**

114.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 113 as if fully set forth herein.

115.     Plaintiff brings this cause of action on behalf of the California Subclass.

116.     Pursuant to California Insurance Code Section 10234.8, at all times relevant hereto, MetLife owed all VIP2 OLD policyholders (including Plaintiff) and prospective VIP2 OLD policy purchasers a duty of honesty and a duty of good faith and fair dealing. Cal. Ins. Code § 10234.8(a).

117.     MetLife breached its duties of honesty and good faith and fair dealing in one or more of the following respects:

      a.      By failing to notify Plaintiff that Policy No. 14630-5986 was underpriced and/or that it planned to increase her premiums when she purchased the policy in 2007 and each time she renewed it between 2008 and 2025;

      b.      By never informing Plaintiff about the 58% premium rate increase request it submitted to the California Department of Insurance in 2013 and/or the California Department of Insurance's denial of said request;

      c.      By failing to seek VIP2 OLD premium rate increase(s) on a timely basis so as to minimize the amount of any such increase(s);

      d.      By implying that it needed the 123.8% premium rate increase referenced in its April 21, 2021 – April 21, 2024 correspondence as a result of recent in-depth analysis, when in fact MetLife had known of the growing need for premium rate increases since at least 2008; and/or

      e.      By otherwise acting dishonestly, deceptively, unfairly, in bad faith and without reasonable diligence.

118.    As a direct and proximate result of one or more of the foregoing breaches, Plaintiff suffered economic damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, GERMAINE GAUDET, demands the following relief on behalf of herself and all others similarly situated:

A.      That an Order be entered certifying this action as a Plaintiff class action under Federal Rule of Civil Procedure 23, and appointing Plaintiff as the representative of the classes specified herein;

B.      Compensatory damages in such amount as demonstrated by the proofs at trial and that the Court deems just and proper;

C.      Punitive damages as to Counts for which such damages are available under applicable law and in an amount that the Court deems just and proper;

D.      For an order requiring MetLife to make restitution of all revenues, earnings, compensation and benefits obtained as a result of its wrongful conduct;

E.      For preliminary and permanent injunctive relief requiring MetLife to disclose any future premium rate increase plans to all VIP2 OLD policyholders at or before the time said policyholders renew their policies;

F.      An order granting any other rescission and injunctive relief and other such equitable relief that the Court deems just and proper;

G.      Imposition of a constructive trust;

H.      An appropriate claims resolution facility, funded by MetLife, to administer relief to the classes in this case;

I.    All statutory damages including all exemplary damages available under any applicable statutory provision;

J.    Costs of litigation and attorneys' fees; and

K.    All other appropriate relief.

## **DEMAND FOR JURY TRIAL**

Plaintiff, GERMAINE GAUDET, and all others similarly situated, hereby demands a trial by jury on all issues.

Dated: January 21, 2025                         Respectfully submitted,

                                                **GERMAINE GAUDET, and all others similarly situated,**

                                                By: */s/ Thomas C. Cronin*
                                                         One of her Attorneys

                                                Thomas C. Cronin (SBN 200754)
                                                CRONIN & CO., LTD.
                                                120 LaSalle Street, 20th Floor
                                                Chicago, Illinois 60602
                                                Telephone: 312-500-2100

                                                Robert R. Duncan (Pro Hac Vice Forthwith)
                                                James Podolny (Pro Hac Vice Forthwith)
                                                DUNCAN LAW GROUP, LLC
                                                161 North Clark St, Suite 2550
                                                Chicago, Illinois 60601
                                                Telephone: 312-202-3283
                                                Fax: 312-202-3284

                                                Matthew P. Kelly (SBN 224297)
                                                THE LAW OFFICE OF MATTHEW P. KELLY
                                                4652 Glenalbyn Drive
                                                Los Angeles, CA 90065
                                                Telephone: 310-483-3608