UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERMAINE GAUDET,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>　　　　Defendant. | Case No. 25-cv-00694-PCP<br><br>**ORDER GRANTING MOTION TO DISMISS AND MOTION TO STAY**<br><br>Re: Dkt. Nos. 34, 45 |

　　　　Plaintiff Germaine Gaudet brings this class action against defendant Metropolitan Life Insurance Company ("MetLife"). Gaudet purchased a MetLife long-term-care insurance policy in 2007.[1] In 2021, the California Department of Insurance ("CDI") approved MetLife's request to raise her premium by 123.8%. After the CDI's approval of the premium increase, MetLife sent Gaudet a letter informing her about the imminent rate increase and giving her information about her options.

　　　　Gaudet alleges that MetLife knew of the need to increase premiums as early as 2008. Gaudet brings three California state law claims based on MetLife's failure to inform her of the rate increase or any of the issues leading to the rate increase until 2021: (1) fraud by omission; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, and (3) violation of California Insurance Code § 10234.8.

　　　　MetLife now moves to dismiss the action pursuant to Federal Rule of Civil Procedure

---

[1] As Gaudet explains in her opposition, long-term care insurance "covers a variety of services for people who become unable to care for themselves, including assistance in the home, adult daycare, assisted living, and nursing home services." *Sieving v. Cont'l Cas. Co.*, 535 F. Supp. 3d 762, 767 (N.D. Ill. 2021). Because individuals generally purchase long-term care insurance policies in their fifties but usually do not submit their first claim until they are at least 80 years old, long-term care insurance requires a long projection period with assumptions running more than 50 years forward.

12(b)(6). For the reasons discussed herein, the Court grants MetLife's motion with leave to amend.

## BACKGROUND

Gaudet resides in San José, California.[2] In November 2006, Gaudet applied for a MetLife long-term care insurance policy.[3] Gaudet's policy became effective on January 19, 2007. Her annual policy premium when purchased was $2,944.45. Gaudet has maintained the policy since that date, and it is still in effect today. Gaudet's current annual premium is $4,541.48.[4] Gaudet's contract for the policy, which she signed in 2006, includes the following key terms:

> **RENEWABILITY: THIS POLICY IS GUARANTEED RENEWABLE FOR LIFE. PREMIUM RATES ARE SUBJECT TO CHANGE.** This means You have the right, subject to the terms of the policy, to continue this policy as long as You pay Your premiums on time. We cannot change any of the terms of this policy without Your consent, except that We may change the premium rates, subject to approval by the California Department of Insurance. Any such change in premium rates will apply to all policies in the same class as Yours in the state where this policy was issued. …
>
> The premium is due and payable on the **Original Coverage Effective Date** of the policy and thereafter in accordance with the Premium Schedule that is in effect for the policy as shown on page 3. The premium must be paid in U.S. currency.
>
> You may change the premium payment mode with Our approval.
>
> The amount of the premium for Your initial coverage is based on Your Original Issue Age, Health Rating and Discounts, as of the Original Coverage Effective Date as shown on page 3.
>
> We reserve the right to change premium rates on a class basis. The premium will not increase because You get older or Your health changes. In the event of a premium increase, We will offer You the option to lower Your premium by decreasing Your benefit amounts.

---

[2] For the purposes of defendants' Rule 12(b)(6) motion, the Court assumes the truth of the facts alleged in plaintiffs' complaint.

[3] Gaudet purchased a VIP2 policy, which is the subject of this action. The complaint also discusses a VIP1 policy that was phased out in favor of the VIP2 policy in 2004.

[4] After receiving repeated notices about the premium rate changes, Gaudet elected to reduce her inflation protection rate from 5% to 3% in response to the April 15, 2024 notice. The current price reflects this adjustment in benefits.

> See the Benefit Decreases provision of this policy. Your premiums will change if We change Your benefit amounts as a result of Your request or as a result of an increase as provided under the terms of this policy.
>
> …
>
> **Your premium is not expected to increase as a result of the benefit increases provided by [the 5% Automatic Compound Inflation Protection] Rider. However, We reserve the right adjust premiums on a class basis.**

(emphasis in original).

In determining the premiums for its long-term care insurance policies, MetLife relied upon certain assumptions. MetLife learned in 2008 that its actual experience materially and adversely deviated from those assumptions. Rather than seek increases in the premium rates for existing customers like Gaudet, "MetLife decided to replace VIP2 policies' premium rate schedule with one based on updated/more accurate lapse, morbidity and mortality assumptions." MetLife introduced its new VIP2 premium rate schedule in all 50 states and the District of Columbia between 2008 and 2010. The schedule only applied to individuals purchasing new VIP2 policies ("VIP2 NEW" policies). Preexisting VIP2 policyholders ("VIP2 OLD" policyholders) like Gaudet were not affected. They were not notified that the rate schedule that their plans were based upon was no longer used for new policies.

MetLife thereafter experienced continued pricing issues. In response, it developed an updated rate action plan for existing VIP2 OLD policies like Gaudet's and sought to implement a 58% premium rate increase on all VIP2 OLD policyholders across the country. Between October 2012 and July 2014, MetLife filed for the rate increase in each state.[5] It filed for a California rate increase with the CDI in 2013, but the CDI denied the requested increase. Between 2012 and 2017, MetLife implemented 10% to 88% premium rate increases on VIP2 OLD policyholders in

---

[5] As the complaint explains, all states except Alaska must approve rate increases to MetLife's long-term care insurance policies before MetLife can implement them. Upon submission of a rate increase request by an insurer, a state can either (1) approve a premium rate increase equal to, less than, or greater than the insurer requested, or (2) deny the request.

37 states. Like California, several other states denied MetLife's premium rate increase request.

In 2015, MetLife developed a second revised rate action plan for VIP2 OLD policies pursuant to which it sought to implement an additional 18.98% premium rate increase on all VIP2 OLD policyholders across the country (totaling an increase of approximately 88% from the original VIP2 OLD pricing). MetLife again sought approval in nearly all states. In 2019, MetLife requested a 105% premium rate increase for California VIP2 OLD policyholders.[6] On or about January 21, 2021, the CDI approved this premium rate increase but increased it to authorize a 123.8% increase to be implemented over the next four years. On April 15, 2021, MetLife informed Gaudet that it would be increasing her annual premium by 123.8% over the next four years, with the first increase occurring on January 19, 2022.[7] MetLife sent subsequent notices on April 15, 2023, April 15, 2024, and April 15, 2025. The notices informed Gaudet of the upcoming implementation of the second, third, and fourth phases of the 123.8% premium rate increase. Those phased increases took effect on January 19, 2023, January 19, 2024, and January 19, 2025.

Since 2015, MetLife (which has now imposed premium rate increases on VIP2 OLD policyholders in every state) has created at least three more rate action plans, seeking increases to VIP2 OLD policyholders' premiums by roughly 16.92% in or around 2019–2020; 31.66% in or around 2021; and 9.88% in or around 2023. If these increases are requested, authorized, and implemented, MetLife will increase all VIP2 OLD policyholders' premiums by about 218% over the original premium.

Gaudet alleges that MetLife never told affected policyholders: (1) that its actual experience deviated from the assumptions it used to initially price VIP2 OLD policies; (2) that its VIP2 OLD policies were underpriced; (3) that MetLife intended to increase VIP2 OLD policyholders'

---

[6] As Gaudet explains, MetLife requested a premium rate increase of more than 88% in order to account for the shortfall caused by CDI's failure to approve its previous rate increase request.

[7] MetLife allowed Plaintiff to mitigate the effects of the rate increase by: (1) eliminating her automatic inflation protection; (2) reducing her annual automatic compound inflation protection rate from 5% to 3%; (3) reducing her daily benefit amount; (4) reducing her benefit duration from lifetime to three years; or (5) canceling her policy. The notice (which is attached to the complaint) explained that if Gaudet cancelled the policy, she would receive limited benefits in the future based on what she had already paid.

4

1  premiums; (4) that it replaced the VIP2 OLD policy series' premium rate schedule with a more
2  accurate one from 2008 through 2010; and/or (5) that it could justify VIP2 OLD premium rate
3  increases actuarily starting in at least 2008. MetLife also never told California policyholders (6)
4  that it sought permission for a 58% premium rate increase on all VIP2 OLD policyholders around
5  the country between 2012 and 2014; and/or (7) that the CDI denied MetLife's 2013 premium rate
6  increase request. Gaudet also alleges based on information and belief that MetLife has not
7  disclosed the full extent of its post-2015 rate action plans to VIP2 OLD policyholders in states in
8  which they have not yet been implemented.

9        Gaudet alleges that had she "known that her policy was underpriced and/or that MetLife
10 planned to increase her premiums in the future, she either: (1) would not have purchased her long-
11 term care insurance policy and/or annually renewed it between 2008 and 202[5]; and/or (2) would
12 have reduced her premiums by decreasing her coverage some time before 2021."

### LEGAL STANDARD

14       Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain
15 statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil
16 Procedure 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim upon
17 which relief can be granted. Dismissal is required if the plaintiff fails to allege facts allowing the
18 court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."
19 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only
20 where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable
21 legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To
22 survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief
23 that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

24       In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the
25 complaint as true and construe the pleadings in the light most favorable" to the nonmoving party.
26 *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal
27 conclusions "can provide the [complaint's] framework," the Court will not assume they are correct
28 unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept

as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

Materials outside the complaint can be considered on a Rule 12(b)(6) motion if they are incorporated by reference therein or otherwise judicially noticeable. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A [district] court may [ ] consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."). The Court may consider documents which are "not physically attached to the complaint" "if the [ ] 'authenticity ... is not contested' and 'the plaintiff's complaint necessarily relies' on them." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998)). Federal Rule of Evidence 201 permits judicial notice of "a fact that is not subject to reasonable dispute" because it is "generally known."

## ANALYSIS

### I. The parties' requests for judicial notice are granted.

MetLife requests that the Court take judicial notice of two documents: (1) a copy of Gaudet's complete application for long-term care insurance; and (2) the Rate Increase History for MetLife's long-term care insurance published by the CDI on their website and dated December 31, 2013, and October 21, 2014. Gaudet requests that the Court take judicial notice of (1) MetLife's October 13, 2004 Initial Rate Filing with the CDI; (2) the October 7, 2005 approval notification for MetLife's October 2004 Initial Rate Filing; and (3) CDI filings related to the 123.8% premium rate increase MetLife imposed starting in January 2022.

The Court grants these requests for judicial notice because each of the documents are public documents, incorporated by reference into Gaudet's complaint, or available from a source whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b). While the Court takes judicial notice of the existence and content of the documents at issue, it will not take judicial notice of the underlying truth of any factual assertions therein.

**II.     Gaudet fails to plead a claim for fraudulent omission.**

To state a claim for fraudulent omission under California common law, a plaintiff must plausibly plead that "(1) [the] defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would have acted differently if she had known of the concealed or suppressed fact; and (5) the plaintiff sustained damage as a result of the concealment or suppression." *Quackenbush v. Am. Honda Motor Co.*, 650 F. Supp. 3d 837, 845 (N.D. Cal. 2023), *aff'd*, No. 24-33, 2025 WL 1009273 (9th Cir. Apr. 4, 2025).

MetLife argues that Gaudet has failed to plead her fraudulent omission claim because it had no duty to disclose the rate action plans prior to their approval by the CDI, after which it promptly did so. The only theory under which Gaudet asserts that MetLife owed her a duty to disclose is that the duty was "directly imposed by statute or other prescriptive law." *SCC Acquisitions Inc. v. Cent. Pac. Bank*, 207 Cal. App. 4th 859, 864 (2012) (cleaned up). Gaudet primarily relies on *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490 (Cal. Ct. App. 2003), which held that certain California Insurance Code sections impose a duty to disclose impending policy changes on insurers. *Id.* at 1499.

The facts presented in *Pastoria* are key to understanding the duty to disclose recognized therein. In that case, the plaintiffs purchased insurance policies between August and November 2001. On November 28, 2001, they received a notice about material changes to the policies. *Id.* at 1493. The plaintiffs alleged that the defendant knew about these changes when it sold them the policies but that class members were not told of the "impending policy changes" until after they purchased the insurance. The court found that the plaintiffs' allegations that the defendant "knew of impending material changes to the insurance policies when the plaintiffs purchased the policies but failed to disclose this information to the plaintiffs until after they purchased their policies" were sufficient to state claims for unfair competition and fraud, explaining:

> [T]he term "impending" means "about to happen" in the sense of a fait accompli. (Webster's Encyclopedic Unabridged Dict. of the English Language (1989 ed.) p. 714.) It is an assertion that such

7

> impending changes amount to more than simply a matter of contemplation or discussion at one level or another of the defendants' controlling executives, officers, employees, and consultants. Fairly read, an impending change to be actionable must be one that is in fact already established according to the insurer's operating procedures, but not implemented at the time a policy is purchased.

*Id.* at 1496–97. *See also Shaffer v. Cont'l Cas. Co.*, No. CV 06–2235–RGK (PJWX), 2006 WL 8435261, at *3 (C.D. Cal. Aug. 9, 2006).

MetLife contends that, unlike in *Pastoria*, Gaudet does not and cannot allege that MetLife knew that it would need to increase premiums at the time Gaudet purchased her policy in January 2007. Instead, the complaint asserts that MetLife learned of that information in 2008. Gaudet responds that insurers have a duty to disclose impending changes to premiums and benefits both at the time of an insurance contract's original formation and upon its modification. *See* Cal. Ins. Code § 361. She contends that each annual renewal of her policy constituted an "original formation" or "modification" of the insurance contract. *See Wheeler v. Am. Fam. Home Ins. Co.*, 632 F. Supp. 3d 1063, 1074 (N.D. Cal. 2022) ("The California Insurance Code dictates that, for purposes of misrepresentations, policy renewals should be treated the same as policy applications."); *Borders v. Great Falls Yosemite Ins. Co.*, 140 Cal. Rptr. 33, 37 (Ct. App. 1977).[8] MetLife argues that unlike the term insurance at issue in *Wheeler* and *Borders*, Gaudet's renewals of her long-term care insurance policy cannot fairly be considered a new policy formation or a modification because MetLife was required to agree to continue the coverage so long as Gaudet continued to make her premium payments.

The Court need not resolve this issue because even if each renewal involved the formation of a new contract, the rate action plans were not "impending" until after the CDI's approval in 2021, at which time MetLife timely notified Gaudet of the impending rate change. As *Pastoria* made clear, an insurer's duty to disclose applies to changes that are "about to happen" or a "fait accompli." Here, an intervening state actor (the CDI) had control over whether MetLife's proposed premium increases would ever be implemented, as demonstrated by the fact that

---

[8] Gaudet also cites *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 927 (9th Cir. 2012), but that case merely states that whether a renewal involves the creation of a new contract is a context-specific determination.

1  MetLife's initial request for rate changes was denied. Until MetLife received CDI approval, its
2  rate action plans were "simply a matter of contemplation or discussion at one level or another of
3  the defendants' controlling executives, officers, employees, and consultants." Under *Pastoria*,
4  MetLife had no duty to disclose such speculative future possibilities to Gaudet.

   Gaudet argues that MetLife had a policy of continuing to request state approval of its rate action plans until they were approved, and that MetLife's rate action plans thus involved something more than a "matter of contemplation or discussion" and should instead be considered "already established according to the insurer's operating procedures" under *Pastoria*. In her view, MetLife's policy meant that the plans were certain to be implemented at some point in the future and thus were sufficiently impending to require disclosure. But the complaint itself acknowledges that any proposed rate increases were not certain without CDI approval. *See* Compl. ¶¶ 30–31 (describing how states can deny requests for rate increases). Until that approval, the proposed rate changes could not be considered "impending" or established. *See Toulon v. Continental Casualty Co.*, 877 F.3d 725, 738 (7th Cir. 2017) (affirming the dismissal of claims based on the alleged nondisclosure of potential future rate increases prior to the purchase of a long-term care policy because "regardless of whether [the insurer] knew it would want to increase rates substantially many years in the future," the insurer could not know whether "the regulators would approve a rate increase"); *Collins v. Metro. Life Ins. Co.*, 117 F.4th 1010, 1018 (8th Cir. 2024) (holding that MetLife had no duty of disclosure under Missouri and Illinois law with respect to future premium increases). *Cf. Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140–41 (9th Cir. 1996) (affirming dismissal of a securities fraud claim challenging a public utility's alleged failure to disclose information related to its rate increase requests and noting that whether the increases would be imposed involved "sheer speculation" based "on an anticipated and contingent outcome" before the state commission responsible for rate approval).

   Because Gaudet has not plausibly alleged that MetLife had any duty to disclose its rate action plans prior to the CDI's 2021 approval of those plans, the Court grants MetLife's motion to dismiss Gaudet's fraudulent omission claim.

9

### III. Gaudet fails to plead a UCL claim.

The UCL prohibits "unfair competition," which is defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders v. Superior Ct.*, 27 Cal. App. 4th 832, 838–39 (1994). "It is not necessary that the predicate law provide for private civil enforcement." *Id.*

Gaudet relies exclusively on the "unlawful" theory of UCL liability and bases her claim of unlawfulness on her allegation that MetLife violated California Insurance Code sections 330, 331, 332, 334, and 361 as interpreted in *Pastoria*. *See Pastoria*, 112 Cal. App. 4th at 1496 (construing these code sections). As explained above, however, her complaint does not plead any violation of the statutory duty identified in *Pastoria*. Further, California Insurance Code § 339 provides that "[n]either party to a contract of insurance is bound to communicate, even upon inquiry, information of his own judgment upon the matters in question." Because MetLife's internal rate action plans were a matter of its own judgment prior to CDI approval, the complaint does not include plausible allegations that MetLife violated the identified code sections by not disclosing the information.

Because Gaudet has not plausibly alleged an unlawful act, the Court grants MetLife's motion to dismiss Gaudet's UCL claim.

### IV. Gaudet fails to plead a claim for a violation of § 10234.8.

California Insurance Code § 10234.8 provides that:

> (a) With regard to long-term care insurance, all insurers, brokers, agents, and others engaged in the business of insurance owe a policyholder or a prospective policyholder a duty of honesty, and a duty of good faith and fair dealing.
>
> (b) Conduct of an insurer, broker, or agent during the offer and sale of a policy previous to the purchase is relevant to any action alleging a breach of the duty of honesty, and a duty of good faith and fair dealing.

10

As with her other claims, Gaudet fails to plead that MetLife violated this provision.[9]

Defendants argue that Gaudet fails to plead a violation of the duty of good faith and fair dealing because she does not plead a breach of contract. *See, e.g.*, *Kunde Enters., Inc. v. Nat'l Sur. Corp.*, 608 F. Supp. 3d 883, 900 (N.D. Cal. 2022) (noting that under California law a breach of the implied covenant of good faith and fair dealing in the insurance context has two elements: "(1) benefits due under the policy must have been withheld and (2) the reason for withholding benefits must have been unreasonable or without proper cause."); *Tran v. Kansas City Life Ins. Co.*, 228 F. Supp. 3d 1068, 1079 (C.D. Cal. 2017) ("[W]here there is no breach of contract there can be no breach of the implied covenant of good faith and fair dealing."). But while the common law duty generally depends on an *existing* contractual obligation, section 10234.8 extends the duty of good faith and fair dealing to *prospective* policyholders.

There is little caselaw addressing this duty owed to *prospective* policyholders but it must encompass something more than a breach of contract. *See* LONG-TERM CARE INSURANCE: IT'S BACK TO THE WILD WILD WEST OF BAD FAITH LITIGATION, Ann.2006 ATLA-CLE 577 ("[T]he statutory duty of honesty and good faith and fair dealing is owed to *both* insureds and applicants and, unlike the common law duty of good faith and fair dealing implied in every insurance contract, is *not* dependent on the issuance of a policy. Exactly how these statutory duties will play out remains to be seen." (emphasis in original)).[10] Given the context in which Gaudet's claim arises, however, the Court cannot conclude that the California Legislature intended for section 10234.8 to create duties of disclosure beyond those already imposed upon MetLife by both the common law and the extensive statutory and regulatory requirements that apply to the highly regulated long-term care insurance industry. Those existing sources of law provide extensive guidance as to the circumstances under which such a duty exists, and nothing in section 10234.8

---

[9] MetLife contends that there is no private right of action to enforce section 10234.8. *See Matthews v. Prudential Ins. Co. of Am.*, No. 8:24-CV-00497-JVS-JDE, 2024 WL 4406927, at *6 (C.D. Cal. Aug. 16, 2024). Because Gaudet has not plausibly alleged a violation of the statute, the Court need not reach the question.

[10] The absence of such guidance is perhaps a result of the fact that it appears no plaintiff has previously been allowed to pursue a claim under section 10234.8.

11

suggests that its purpose was to displace that well-established law with an entirely different set of duties.

Gaudet also cannot pursue a duty of honesty claim. As discussed above, MetLife was honest with Gaudet. Her insurance policy disclosed that her premiums were subject to change. As soon as the CDI approved MetLife's proposed rate increase, MetLife timely notified her of the upcoming increase, and for the reasons noted above MetLife had no duty to disclose non-impending changes.

For these reasons, Gaudet does not plausibly allege a violation of California Insurance Code Section § 10234.8, and the Court grants MetLife's motion to dismiss that claim.

## CONCLUSION

For the reasons discussed herein, the Court grants MetLife's motion to dismiss Gaudet's complaint.[11] Dismissal is with leave to amend. Any amended complaint must be filed within 28 days of this Order.

Because there is no longer an operative complaint pending before the Court, the Court grants MetLife's motion to stay discovery. *See* Dkt. No. 45. All discovery shall be stayed in this action until such time as MetLife files an answer to any amended complaint. The Court vacates any existing deadlines set forth in the Federal Rules of Civil Procedure, this Court's Local Civil Rules, or any order of this Court except for the deadline for an amended complaint.

**IT IS SO ORDERED.**

Dated: August 25, 2025

_____
P. Casey Pitts
United States District Judge

---

[11] Although MetLife identified other purported defects in Gaudet's complaint in its motion to dismiss, such as the alleged untimeliness of her claims, the Court need not address them given its conclusion that the complaint fails to plead any viable cause of action. Should Gaudet file an amended complaint, MetLife may assert those arguments in any subsequent motion to dismiss.